IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOSEPH N. MONTELEONE,
      Plaintiff,

vs.                          Case No.:  5:14cv65/WS/EMT

CORIZON, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Joseph N. Monteleone ("Monteleone"), an inmate of the Florida Department of Corrections ("FDOC") proceeding pro se and in forma  pauperis ("IFP"), commenced this civil rights action by filing a complaint under 42 U.S.C. § 1983 (doc. 1).  Presently before the court is Defendants' motion for summary judgment, separate statement of undisputed material facts, and supporting evidentiary materials (docs. 22, 23, 24).  Monteleone filed a response in opposition to Defendants' motion and supporting evidentiary materials (doc. 26).  He did not file a separate statement of material facts as to which it is contended there exists a genuine issue to be tried.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); and Fed. R. Civ. P. 72(b).  For the reasons set forth below, the court recommends that Defendants' motion for summary judgment be granted.

I.      BACKGROUND AND PROCEDURAL HISTORY

Monteleone commenced this action on March 3, 2014 (doc. 1).  Although he initially named three Defendants, he states in his response to Defendants' motion for summary judgment that he is dismissing Defendant Michael Johnson from this action, leaving only Defendants Corizon and Dr. Jorge Alvarez (doc. 26).  In his complaint, Monteleone claims that Corizon and Dr. Alvarez were deliberately indifferent to the sciatica and neuropathic pain from which he suffers, in violation of

the Eighth Amendment (doc. 1 at 15–16).[1]  He states he has suffered physical and mental pain and suffering as a result of their conduct (*id.* at 8–18).  Monteleone seeks declaratory and injunctive relief (*id.* at 15–18).  He also seeks from each Defendant compensatory damages in the amount of $250,000.00 and punitive damages in the amount of $500,000.00 (*id.* at 18–19).

Defendants timely filed their motion for summary judgment on December 22, 2014 (doc. 23). The court issued an advisement order concerning summary judgment, which provided the parties with information concerning Rule 56 review (doc. 25).  Monteleone filed his response to Defendants' summary judgment motion on February 4, 2015 (doc. 26).

II.      LEGAL STANDARDS

A.      Summary Judgment Standard

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).  "A mere

---

[1]  The page numbers in this Report are the numbers assigned by the court's electronic docketing system, rather than the page numbers or exhibit references the parties may have designated.

scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her. *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See* Celotex Corp., 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.   Failure to Provide Adequate Medical Care

Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *See* Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). To prevail on a claim of deliberate indifference, a plaintiff must show (1) a serious medical need; (2) deliberate indifference to that need on the part of the defendant; and (3) causation between the defendant's indifference and the plaintiff's injury. *See* Mann v. Taser Intern, Inc., 588 F.3d 1291, 1306–07 (11th Cir. 2009). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1307 (quotation omitted). Alternatively, a plaintiff can establish a serious medical need by showing that a delay in treatment worsened his or her condition. *Id.*

To establish deliberate indifference, a plaintiff must show "(1) a subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Goodman v. Kimbrough, 718 F.3d 1325, 1331–32 (11th Cir. 2013) (internal quotation marks omitted).  Indeed, to show deliberate indifference, the defendant's response to the medical must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and quotations omitted).  Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *See* McElliott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).  "Deliberate indifference" can include "the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified." Taylor, 221 F.3d at 1259–60 (internal quotation omitted).  A simple difference in medical opinion between the medical staff and an inmate as to the latter's diagnosis or course of treatment does not establish deliberate indifference. *See* Adams v. Poag, 61 F. 3d 1537, 1545 (11th Cir. 1995) (the question of whether a plaintiff should have received different diagnostic tests or treatments is not an appropriate basis for grounding liability on a deliberate-indifference claim); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).

III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    A.    Material Facts

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Monteleone, the nonmoving party  *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  The court does so here, referring to Defendants' statement of undisputed, and taking those facts from the parties' pleadings and summary judgment materials of record. Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Applying these standards, the court conveys the following as the material facts for purposes of Defendants' motion for summary judgment.

Corizon is a private corporation that, pursuant to contract with the FDOC, provided medical services to inmates at the Apalachee Correctional Institution ("ACI") (doc. 24, Defendants' Statement of Undisputed Facts ¶ 1; doc. 22-2, Affidavit of Jorge Alvarez, M.D. ¶ 1).  Dr. Alvarez has served as the Medical Director at ACI since 2011 (Defendants' Statement of Undisputed Facts ¶ 2; Alvarez Aff. ¶ 1).

In 2010, Monteleone had a MRI for his back condition (Complaint, ¶¶ 4–5).  The lumbar spine MRI resulted in an overall assessment of multilevel degenerative disc disease (at certain levels between L2–L5, as well as L5–S1) and specific findings including the following:

1. L2-3 level disc bulge, mildly diffuse and mildly compressive upon the thecal sac.

2. L4–5 level disc bulge, moderate with superimposed left paracentral disc protrusion compressive and extending into the left lateral recess.

3. L5-S1 level disc bulge with probable superimposed left paracentral disc protrusion compromising the right S1 nerve root and also with slight extension into the left lateral recess.

(doc. 22-3 at 118–19).  Monteleone's radiographic studies and reported symptoms are consistent with a diagnosis of sciatica, which is a type of neuropathic pain (pain caused by abnormalities of the nerves in the body) (Alvarez Aff. ¶ 4).  The MRI shows compression of the left S1 nerve root, which could cause pain that could radiate down the leg along the path of the S1 nerve (*id.*).

Also in 2010, Monteleone saw Dr. Maxwell Steele, an orthopedic specialist, who ordered physical therapy and prescribed Neurontin for pain (Complaint, ¶¶ 6–7).  From 2010–2013, Monteleone's back condition was treated with Neurontin, orthopedic boots, medical passes for a low bunk, and medical passes for no prolonged standing, pushing, pulling, or lifting (*id.*, ¶ 8; doc. 22-3 at 32, 35–40, 42, 113–15).  On September 9, 2013, Monteleone was seen by Nurse McDowell (doc. 22-3 at 108; Alvarez Aff. ¶ 25).  Monteleone told Nurse McDowell he had been prescribed baclofen in 2011 for his back, and that the Neurontin "is not working as good now" (*id.*).  Nurse McDowell referred Monteleone's chart to an Advanced Registered Nurse Practitioner ("ARNP") or doctor for evaluation of possible changes in his medication (doc. 22-3 at 108).  On September 18, 2013, Monteleone requested a renewal of his prescription for Neurontin (*id.* at 102).  Nurse Brown referred his chart for review by a doctor (*id.*).  The same day, Dr. Franco-Rivera reissued Monteleone's prescription for Neurontin (*id.* at 40, 99).

On November 18, 2013, Dr. Alvarez issued an order discontinuing Monteleone's prescription for Neurontin (Defendants' Statement of Undisputed Facts ¶¶ 4, 19; Alvarez Aff. ¶¶ 4, 21, 22; doc. 22-3 at 31).  Dr. Alvarez discontinued the prescription for Neurontin in response to a directive from Corizon's Regional Medical Director to discontinue the use of Neurontin for the treatment of

neuropathic pain (Alvarez Aff. ¶¶ 4, 21, 22).  Dr. Alvarez understood the reasons for Corizon's directive, and concurred with the reasoning (*id.*).  The reason for the medical decision to discontinue Neurontin was because it was not approved by the FDA for neuropathic pain, and scientific studies showed it to be no more effective than a placebo for neuropathic pain (*id.*).  Neurontin also carried a risk for abuse (*id.*).  Despite the lack of FDA approval of Neurontin for neuropathic pain, doctors began using it for neuropathic pain as an "off label" use (Alvarez Aff. ¶ 22).  Monteleone's sciatica, which is a type of neuorpathic pain, would have been the reason he was prescribed Neurontin (*id.*).  It is appropriate and within the standard of care in some instances to use drugs for the treatment of conditions for which they have not received FDA approval (*id.*).  However, over time, questions arose whether it was appropriate to prescribe Neurontin for neuropathic pain (*id.*).  Studies were published showing Neurontin was no more effective than a placebo for neuropathic pain (*id.*).  Neurontin affects the central nervous system (*id.*).  It can be abused to achieve a euphoric and/or sedative effect (*id.*).  The lack of medical evidence supporting the efficacy of Neurontin and its potential for abuse led to the decision to discontinue its use for patients with neuropathic pain (*id.*).  Nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as naproxen, provide appropriate pain relief without the risk of abuse associated with Neurontin (*id.*).

Monteleone alleges other inmate at ACI were prescribed Neurontin after his prescription was discontinued (Complaint, ¶ 22).  Dr. Alvarez states that if any patients were still receiving Neurontin after the new directive, it was because they were mistakenly left on it, or there were special circumstances related to their individual conditions (Alvarez Aff. ¶ 23).  For example, although Neurontin is not the primary medication used for seizure control, it could possibly be prescribed for that condition if other medications were not deemed to be sufficiently effective (*id.*).

On November 21, 2013, Monteleone submitted a sick call request complaining of sharp, shooting pain in his lower back and extending down the back of his left leg (Complaint, ¶ 19).  Nurse McDowell responded to his sick call request (Complaint, ¶ 20, Defendants' Statement of Undisputed Facts ¶ 5; Alvarez Aff. ¶ 5; doc. 22-3 at 94–96).  Monteleone told Nurse McDowell that the only thing that helped his back pain was Neurontin, but McDowell explained that he would not be prescribed Neurontin (*id.*).  Monteleone's medical records reflect that Nurse McDowell offered over-the-counter medications and topical balm, which Monteleone refused, and that Nurse

McDowell instructed Monteleone to use ice compacts or cold compresses, and to return if the symptoms worsened (*id.*).  Monteleone denies that Nurse McDowell offered over-the-counter medications and topical balm (doc. 26, Ex. B, Affidavit of Joseph N. Monteleone, ¶ 4); however, he does not state he would have accepted those treatments.  He also denies he was instructed to use ice compacts or cold compresses (Monteleone Aff. ¶ 5).

Less than two weeks later, on December 3, 2013, Monteleone submitted a sick call request complaining of pain in his lower back and leg (Complaint, ¶ 24).  He was seen by Nurse Branch on December 6, 2013 (Alvarez Aff. ¶ 6; doc. 22-3 at 92–93)  Monteleone reported that Neurontin relieved his pain (*id.*).  He reported that his pain began two weeks earlier, and he rated the pain at a 7 out of 10 (*id.*).  He described the pain as sharp, located in the left lumbar region, localized, and aggravated by walking (*id.*).  He reported he could not find a comfortable position, and nothing decreased the pain (*id.*).  He reported constant tingling in his left foot (*id.*).  Nurse Branch submitted Monteleone's  medical file to Dr. Alvarez for review (Complaint, ¶ 25; Alvarez Aff. ¶ 6; doc. 22-3 at 92–93).  On December 9, 2013, Dr. Alvarez conducted a chart review and assessed Monteleone as suffering from chronic back pain (Defendants' Statement of Undisputed Facts ¶ 6; Alvarez Aff. ¶ 7; doc. 22-3 at 30, 91).  Dr. Alvarez was not able to determine whether Monteleone was truly experiencing more pain from his sciatica after the Neurontin was discontinued; however, Dr. Alvarez treated Monteleone under the assumption that his complaints of pain were genuine (Defendants' Statement of Undisputed Facts ¶ 20; Alvarez Aff. ¶ 27).  In Dr. Alvarez's medical judgment, naproxen was the appropriate pain medication to prescribe (*id.*).  Based upon his review of the records, including the nursing notes, and to expedite the provision of medication to Monteleone, he prescribed naproxen 500 mg. twice a day for 90 days, and for Monteleone to be followed in three months (Complaint, ¶ 28; Defendants' Statement of Undisputed Facts ¶ 6; Alvarez Aff. ¶ 7; doc. 22-3 at 30, 91).

On December 12, 2013, Monteleone submitted another sick call request complaining of pain in his lower back and left leg (Complaint, ¶ 31).  He was seen by Nurse Branch on December 16, 2013, and complained that he was in a lot of pain in his lower back, the pain radiated down his left leg and made walking difficult, and his left foot was numb (Complaint, ¶¶ 32–33; Alvarez Aff. ¶ 8; doc. 22-3 at 89–90).  Monteleone reported that Neurontin or baclofen decreased or reduced his pain,

but naproxen did nothing for his pain  (*id.*).  Nurse Branch referred him for evaluation (Complaint, ¶ 35; doc. 22-3 at 89–90).  Dr. Alvarez saw Monteleone on December 18, 2013 (Defendants' Statement of Undisputed Facts ¶ 7; Alvarez Aff. ¶ 9; doc. 22-3 at 87).  Monteleone complained of back pain that was 7 out of 10 and stated it started in the left lower back and buttocks and radiated to the lower leg with a numbness sensation (*id.*).  Dr. Alvarez noted that Monteleone sat and stood without difficulty and had full range of motion in all joints (Alvarez Aff. ¶ 9; doc. 22-3 at 87).  Dr. Alvarez's examination revealed normal spinal alignment with no obvious spinal deformity (*id.*). Neurologically, Monteleone's deep tendon reflexes were normal at 2+ in the upper and lower extremities with no neurological deficits, such as muscle wasting or the inability to properly activate muscles (Defendants' Statement of Undisputed Facts ¶ 7; Alvarez Aff. ¶ 9; doc. 22-3 at 87). Dr. Alvarez noted a positive straight leg raising test, meaning, pain in the lower back when raising legs from the sitting position (Alvarez Aff. ¶ 9; doc. 22-3 at 87).  Monteleone states he was in noticeable pain and limping due to pain in his left leg (doc. 26, Ex. B, Affidavit of Joseph N. Monteleone ¶ 12). He states he could not stand and had to sit down and lean to his right to relieve the pain (*id.*).  He states that due to the pain, he was unable to perform the movements that Dr. Alvarez asked him to perform (*id.*).  Monteleone states he asked if he could be put back on Neurontin or baclofen and receive a consultation with an orthopedic specialist, but Dr. Alvarez responded that naproxen was "all that he would get" (Complaint, ¶¶ 38–39; Monteleone Aff. ¶ 6).  Dr. Alvarez states he did not record any such requests in Monteleone's medical records, which is his normal practice; however, assuming Monteleone made theses requests, he would not have honored them (Alvarez Aff. ¶ 9). Dr. Alvarez states Neurontin was no longer an approved medication for neuropathic pain, nor was it medically indicated (*id.*).  Alvarez states baclofen was also not medically indicated  (*id.*).  He additionally states a request for an orthopedic consultation was not medically indicated at the time, because he wanted to see how Monteleone did with naproxen substituted for Neurontin, and this change had been made relatively recently (just nine days prior) (*id.*).  Dr. Alvarez planned to continue the current plan of care and to review the previous MRI report and conduct a chart review in two weeks (Alvarez Aff. ¶ 9; doc. 22-3 at 87).

On December 24, 2013, Monteleone was seen twice by members of the nursing staff after reporting that he slipped, fell, and hit his head (Complaint, ¶ 41–42; Defendants' Statement of

Undisputed Facts ¶ 8; Alvarez Aff. ¶ 10; doc. 22-3 at 83–86).  Monteleone states in his Complaint that he fell because his was having sharp pains in his lower back and left leg, which gave out, and that he reported this to the medical staff (Complaint, ¶ 41; Monteleone Aff. ¶ 7).  Monteleone suffered a superficial bump and abrasion on his forehead and was provided an ice pack (Defendants' Statement of Undisputed Facts ¶ 8; Alvarez Aff. ¶ 10; doc. 22-3 at 83–86).  His evaluation revealed no intercranial injuries (*id.*); no neurological deficits were caused by this incident (*id.*); and Monteleone did not report any further problems related to this event (*id.*).

On January 7, 2014, Dr. Alvarez reviewed the report on Monteleone's previous MRI from March 11, 2010 (Defendants' Statement of Undisputed Facts ¶ 9; Alvarez Aff. ¶ 11; doc. 22-3 at 82). He noted that the report indicated multi-level degenerative disc disease with L4-L5 disc bulge and L5-S1 disc bulge (*id.*).  His assessment was that Monteleone suffered chronic back pain due to lumbar degenerative disc disease with herniated discs at L4–L5 and L5-S1 (*id.*).  His plan was to continue the present plan of care (*id.*).

On January 20, 2014, Monteleone submitted a sick call request complaining of pain in his lower back and left leg, but he was never seen by medical staff (Complaint, ¶ 45).  There is no evidence that the request was received by medical staff.

On January 29, 2014, Dr. Alvarez walked through Monteleone's dormitory (Complaint, ¶ 46; Monteleone Aff. ¶ 14).  Monteleone states that when Dr. Alvarez walked by his cell, he asked Dr. Alvarez what he was going to do for his back pain, but Dr. Alvarez walked away without responding (*id.*).  Dr. Alvarez states that he makes these rounds in the dormitories to inspect whether there is generally a clean and healthy environment (Alvarez Aff. ¶ 31).  He states theses rounds are not designed to be part of providing individual patient care (*id.*).  He states any encounter he would have had with Monteleone in this setting would not have been a medical encounter (*id.*).  He states when he makes these rounds in the dormitory, he does not delve into the specifics of any non-acute conditions of any of the inmates (*id.*).

On February 5, 2014, Dr. Alvarez saw Monteleone in the Chronic Illness Clinic (Complaint, ¶ 47; Defendants' Statement of Undisputed Facts ¶ 10; Alvarez Aff. ¶ 12; doc. 22-3 at 112). Monteleone reported that his lower back pain had not been relieved since he was removed from Neurontin and placed on naproxen (*id.*).  Dr. Alvarez's objective examination revealed no

abnormalities (Alvarez Aff. ¶ 12). He performed a clinical test that showed that sensation in Monteleone's feet was within normal limits, and his physical examination was stable (*id.*).  His assessment was that Monteleone had chronic lumbar pain that was in fair control (*id.*).  Dr. Alvarez noted that Monteleone might be a candidate for surgery, but an updated MRI would be needed prior to a surgical evaluation (Defendants' Statement of Undisputed Facts ¶ 10; Alvarez Aff. ¶ 12; doc. 22-3 at 112).  Dr. Alvarez submitted a request for approval of a new MRI to be evaluated by an orthopedic or neurological specialist (Defendants' Statement of Undisputed Facts ¶ 10; Alvarez Aff. ¶ 12, doc. 22-3 at 116–17).  Dr. Alvarez submitted the request to accommodate Monteleone's request that surgery be considered, and because Monteleone's previous MRI demonstrated abnormalities and he was continuing to complain of pain and some sensory deficits in his left leg (Defendants' Statement of Undisputed Facts ¶ 12; Alvarez Aff. ¶¶ 12,  30).

On February 7, 2014, Dr. Alvarez's request for approval for a new MRI in advance of a referral for possible surgery was not authorized by utilization management (Defendants' Statement of Undisputed Facts ¶ 11; Alvarez Aff. ¶ 13).  An alternative treatment plan of in-house physical therapy was recommended (Defendants' Statement of Undisputed Facts ¶ 11; Alvarez Aff. ¶¶ 13, 29; doc. 22-3 at 81).  On February 10, 2014, Dr. Alvarez performed a chart review and noted the response from utilization management (*id.*).  He noted that the utilization management recommendation would be followed and Monteleone would be provided in-house physical therapy, meaning, a demonstration and written instructions on exercises that Monteleone could perform that may help with his sciatica (*id.*).  Dr. Alvarez states it appears that he mistakenly failed to enter a physician's order for in-house physical therapy, because the records do not reflect that he did so (Alvarez Aff. ¶ 29).  He states this was a simple mistake and not a conscious decision on his part, because if he had made a conscious decision <u>not</u> to follow the recommendation, his progress note would not state that he was going to follow it (*id.*).  Dr. Alvarez states that his inadvertent failure to order in-house physical therapy did not subject Monteleone to any risk that his condition would worsen or become more painful (*id.*).

Dr. Alvarez states he did not appeal the utilization review decision disapproving a new MRI, because he believed an appeal would have been unsuccessful (Defendants' Statement of Undisputed Facts ¶ 12; Alvarez Aff. ¶ 30).  He reiterates that he submitted the request for a new MRI to

accommodate Monteleone's request that surgery be considered, and because he knew that a new MRI would be required in order for Monteleone to be seen for a surgical consultation (*id.*). He states the previous MRI demonstrated abnormalities, and Monteleone's continuing complaints of pain and some sensory deficits in his left leg could have potentially justified a new MRI in advance of a referral for possible surgery (*id.*). However, Dr. Alvarez states he understood the rationale supporting the utilization management decision disapproving a new MRI, and he did not disagree with the rationale (*id.*). He states surgery is not indicated for lower back pain alone, and Monteleone's report of sensory deficits did not support surgical intervention (*id.*). Dr. Alvarez states that before the risks of surgery are justified, a patient should exhibit signs of neurological deficits, such as muscle wasting or the inability to properly activate muscles (*id.*). He states Monteleone did not exhibit any such signs (*id.*). Dr. Alvarez additionally states that because surgery was not medically indicated, a new MRI in advance of a referral for possible surgery was unnecessary (*id.*).

Dr. Alvarez saw Plaintiff again on February 19, 2014 (Complaint, ¶ 49; Defendants' Statement of Undisputed Facts ¶ 13; Alvarez Aff. ¶ 14; doc. 22-3 at 75). Monteleone complained of shooting back pain at a level of 7 out of 10, starting in his left lower back and buttock and radiating to his lower left leg with a numbness sensation (*id.*). He reported that his current treatment plan was not alleviating his pain (*id.*). Monteleone states he was in noticeable pain and limping due to pain in his left leg (Monteleone Aff. ¶ 12). He states he could not stand and had to sit down and lean to his right to relieve the pain (*id.*). He states that due to the pain, he was unable to perform the movements that Dr. Alvarez asked him to perform (*id.*). On the other hand, Dr. Alvarez noted that Monteleone could sit and stand without difficulty (Defendants' Statement of Undisputed Facts ¶ 13; Alvarez Aff. ¶ 14; doc. 22-3 at 75). On his objective examination, he noted that Monteleone moved all of his extremities well, and that he had no edema (*id.*). Dr. Alvarez noted that Monteleone had positive pulses with full range of motion (*id.*). He noted that all of Monteleone's joints were normal, and Monteleone had normal spinal alignment with no obvious spinal deformity (*id.*). Dr. Alvarez did not note any neurological deficits (*id.*). Monteleone's straight leg raising test was positive (pain in the lower back when raising legs from sitting position ) (*id.*, ¶¶ 9, 14). Dr. Alvarez's assessment was chronic back pain (*id.*, ¶ 14). His plan was to continue the current plan of care (*id.*).

Monteleone alleges that during this visit, Dr. Alvarez told him he would not receive an MRI, surgery, or a consultation with a specialist, because his back condition was not a result of an occurrence in the FDOC, and the FDOC thus had no responsibility to provide specialized services (Complaint, ¶ 49; Monteleone Aff. ¶¶ 8–9).  Monteleone alleges that when he asked Alvarez why he had previously received an MRI in 2010, Alvarez told him that he did not know and did not care, but the only treatment he would receive was either naproxen or ibuprofen (*id.*).  Dr. Alvarez does not recall the specifics of his discussions with Monteleone about the utilization management decision, but he states Monteleone misinterpreted what he told him (Alvarez Aff. ¶ 14).  Dr. Alvarez states he would not have told Monteleone that he would not receive an MRI or other specialized services because he had a pre-existing condition, because it does not matter whether the event that caused the condition occurred in prison or elsewhere (*id.*).  Dr. Alvarez also states he would not have referred Monteleone for a new MRI in advance of a referral for possible surgery if he thought he could not receive those services (*id.*).  He states utilization management considered his referral and decided that Monteleone's condition did not medically require specialized care at that time (*id.*).  Dr. Alvarez states he would not have told Monteleone that specialized services would never be approved, because Monteleone's condition could change in the future (*id.*).  He states he may have told Monteleone that it was irrelevant that he received an MRI in the past, because the recent utilization management decision was based on Monteleone's present condition (*id.*).  Dr. Alvarez states he also may have told Monteleone that the only medication that would be prescribed for his complaints of pain would be medications such as ibuprofen or naproxen, because that is the plan of care he intended to follow (*id.*).  Alvarez states he would have made it clear to Monteleone that at that time, Neurontin was not going to be an option for him (*id.*).

Dr. Alvarez saw Monteleone on March 10, 2014, regarding his request for "comfort boots" and to follow-up on his low back pain (Alvarez Aff. ¶ 16).  Monteleone told Alvarez that he needed the boots because he had neuropathy, but he acknowledged he was not diabetic (*id.*).  At that time, Corizon's policy was not to provide "comfort boots" except for patients with conditions that could cause problems to develop in their feet, such as diabetes (*id.*).  Dr. Alvarez determined that Monteleone did not meet these criteria (*id.*).  Monteleone did not have diabetes, and Dr. Alvarez's examination of Monteleone's feet showed no foot problems such as ulcers or callouses (*id.*).  He

noted that Monteleone still complained of low back pain even though he was taking NSAIDs, but "comfort boots" are not medically indicated for sciatica (*id.*).  Dr. Alvarez noted that boots were not medically indicated at that time (*id.*).  He did, however, reissue Monteleone's prescription for naproxen 500 mg. twice a day for 180 days (*id.*).

On May 8, 2014, Monteleone reported to sick call complaining of sharp, shooting low back pain radiating down his left leg, and numbness in his left foot (doc. 22-3 at 53–54).  He complained that the pain was constant, that walking made it worse, and that his medicine did not help (*id.*).  He reported that naproxen was not effective for his pain, and requested that Neurontin be restarted (*id.*).  He also requested that his medical passes for low bunk and restricted activity be renewed (*id.*).  Nurse Branch noted that Monteleone's gait was normal, and he had no swelling, discoloration, or bruising (Alvarez Aff. ¶ 18; doc. 22-3 at 53–54).  Nurse Branch scheduled him for an appointment with a doctor (*id.*).  Dr. Alvarez reviewed Monteleone's chart on May 8, 2014 (Defendants' Statement of Undisputed Facts ¶ 16; Alvarez Aff. ¶ 18; doc. 22-3 at 52).  Under the criteria in effect at the time of Monteleone's request for a low bunk pass, a pass would be issued for the following conditions:  post-operative patients, joint fusion of a major joint, seizure disorder, gross obesity, gross neurological dysfunction, fractures and sprains until healed, age above 70, prosthetic limb, and severe temporary illness (Alvarez Aff. ¶ 19).  The low bunk passes issued for some of these conditions that are not permanent in nature are subject to time limitations (*id.*).  Dr. Alvarez did not issue a low bunk pass, because Monteleone did not meet any of the new criteria (*id.*).  Dr. Alvarez states that Monteleone's condition did not place him at any significantly increased risk for falls associated with being placed on an upper bunk, and his medical encounters with Monteleone did not reveal that his back condition could likely cause him to fall (Alvarez Aff. ¶¶ 10, 19).  Dr. Alvarez observed that Monteleone could ambulate without difficulty and get on and off the examination table without assistance (Alvarez Aff. ¶ 10).  It is Dr. Alvarez's medical opinion that within a reasonable degree of medical probability, any pain associated with Monteleone's sciatica would not cause him to fall in an uncontrolled manner (*id.*).

On May 22, 2014, Monteleone again requested renewal of his passes for a low bunk and restricted activity (doc. 22-3 at 52).  Nurse Branch advised him of the new criteria for a low bunk pass, but referred his chart to a doctor for renewal of his pass for restricted activity (*id.*).  Dr.

Alvarez reviewed his chart on May 22 and renewed his medical pass for restricted activity (no pulling, pushing, or lifting above 20 pounds) (*id.* at 51). Dr. Alvarez saw Monteleone on May 23, 2014, in follow-up for acute gastroenteritis and for evaluation of a restricted diet (Defendants' Statement of Undisputed Facts ¶ 17; Alvarez Aff. ¶ 20; doc. 22-3 at 50). Dr. Alvarez noted that Monteleone had been seen the previous day at sick call and his restricted activity pass was updated, but a lower bunk pass was not issued pursuant to policy (*id.*). Monteleone voiced no complaints regarding gastro-intestinal issues and his special diet was not renewed because it was not deemed to be medically indicated at the time (*id.*). Dr. Alvarez noted that Monteleone's lumbar degenerative disc disease was stable and that he would continue the present plan of care (*id.*).

Monteleone was transferred to Wakulla Correctional Institution on or about June 12, 2014 (Defendants' Statement of Undisputed Facts ¶ 18; Alvarez Aff. ¶ 15). Dr. Alvarez did not care for Monteleone after June of 2014, even though Monteleone was transferred back to ACI in August of 2014 (*id.*). On December 3, 2014, Nurse Parker issued Monteleone a one-year low bunk pass (doc. 22-3 at 2; doc. 26, Ex. F). Nurse Parker also prescribed Clinoral (an NSAID) and provided in-house physical therapy (*i.e.*, he instructed Monteleone how to perform back exercises and provided a handout for the exercises) (doc. 22-3 at 2).

Dr. Alvarez states that although Monteleone complained of unrelieved pain after his prescription for Neurontin was discontinued, it was difficult to determine the accuracy of his complaints (Alvarez Aff. ¶ 24). Dr. Alvarez states pain is subjective, and patients can complain of pain when they are not actually experiencing pain (*id.*). He states that at times, it is difficult for a doctor to determine whether a patient's report of pain, and the amount of pain reported, is accurate (*id.*). Dr. Alvarez found that Monteleone's description of the pain he was experiencing did not correlate with Alvarez's clinical examination and observations (*id.*). For example, on December 18, 2013, and on February 19, 2014, Monteleone complained of pain at a 7 on a scale of 10, but Alvarez did not note any obvious signs of pain, which he would have recorded on the progress note if observed (*id.*). Also, Dr. Alvarez's physical examination noted no abnormalities on either visit (*id.*). Additionally, on both occasions Alvarez noted that Monteleone moved all extremities well, and he could sit and stand without difficulty (*id.*). Dr. Alvarez states these movements would not be expected if a patient had the type of pain in the back, buttock, and leg that Monteleone reported to

be experiencing (*id.*).  Dr. Alvarez states it also is confounding that Monteleone described relief from sciatica with Neurontin but that naproxen did not provide relief (*id.*).  Alvarez states this is contrary to the medical evidence relating to these medications (*id.*).  He states evidence-based medicine does not provide support that Neurontin provides relief for neuropathic pain; whereas there is ample data supporting the efficacy of naproxen (*id.*).  Dr. Alvarez states it is possible that Monteleone could have been experiencing a placebo effect from Neurontin (*id.*).  However, assuming Monteleone truly experienced a placebo effect from Neurontin, naproxen, which is known to be effective, should have provided pain relief equal to or exceeding the placebo effect of the Neurontin (*id.*).  Dr. Alvarez states that prescribing Neurontin solely for a potential placebo effect would not be medically appropriate (*id.*).

Dr. Alvarez states it is possible that Monteleone's complaints of pain following the discontinuation of Neurontin were not genuine but designed to try to get Neurontin prescribed again (Alvarez Aff. ¶ 25).  Dr. Alvarez states that on September 9, 2013, Monteleone was seen by Nurse McDowell and requested baclofen (*id.*).  Monteleone told Nurse McDowell that he had received baclofen in 2011 for back spasms, and he stated that the Neurontin was "not working as good now." (*id.*).  Dr. Alvarez states this could indicate that any placebo effect that Monteleone was getting from the Neurontin was diminishing (*id.*).  Dr. Alvarez states would not have prescribed baclofen, because from his review of the medical records and personal evaluation of Monteleone, he found no medical indication for the prescription of baclofen during the period of time following the discontinuation of his prescription of Neurontin (Alvarez Aff. ¶ 27).  Alvarez states that baclofen is a muscle relaxer, and it can be abused for its sedative effect (*id.*).  He states Monteleone did not report or exhibit muscle spasms (*id.*).  Additionally, baclofen, like Neurontin, can be abused by patients seeking its sedative effects (Alvarez Aff. ¶ 25).

Dr. Alvarez states that in his medical judgment, naproxen was the appropriate medication to prescribe for Monteleone's complaints of pain, and, other than medications similar to naproxen, there were no other pain medication alternatives to offer Monteleone that would be medically indicated (Alvarez Aff. ¶ 27).  He states prescription of a narcotic for chronic pain is only done in very exceptional cases (*id.*).  He states Monteleone did not evidence signs or symptoms that would indicate the need for a narcotic medication (*id.*).

Dr. Alvarez states that with respect to the medical decisions he made concerning Monteleone's medical care, he met or exceeded the prevailing professional standard of care for medical doctors in the State of Florida (Alvarez Aff. ¶ 32).  He states he exercised his independent medical judgment with respect to the decisions he made concerning Monteleone's medical care (*id.*).  Dr. Alvarez states that while some of the medical decisions he made were pursuant to directives and/or policies initiated by Corizon, he agreed with the medical decisions that resulted from those directives or policies (*id.*).  He states that the fact that certain policies or practices changed over time did not mean that the new policies, to the extent they were more restrictive, resulted in medical care that was provided at a level that was below the standard of care (*id.*).  Dr. Alvarez states that inmates often seek special privileges, such as special shoes and low bunks (*id.*).  He states the utilization of defined criteria for the provisions of such things is helpful to avoid the appearance that preferential treatment has been provided (*id.*).  Dr. Alvarez states that he followed the then-current criteria in denying certain requests made by Monteleone because Monteleone did not meet the criteria (*id.*).  He states that in his opinion, the denial of these requests was medically appropriate (*id.*).  Dr. Alvarez states he never ignored Monteleone's complaints or purposefully did anything with the intent of causing him any harm or undue discomfort (*id.*).  He states that although Monteleone disagreed with his medical decisions, he made those decisions in good faith and in the exercise of sound medical practice that met or exceeded the standard of care (*id.*).

B.    <u>Analysis</u>

Monteleone claims that Corizon's policy of discontinuing the use of Neurontin for neuropathic pain, and its policies setting forth the criteria for referral for an MRI, surgery, consultation with a specialist, specialized footwear, and a low bunk pass, deprived him of necessary medical treatment for his sciatica and neuropathic pain.  He claims that Dr. Alvarez's failure to prescribe effective pain medication, failure to appeal the utilization management's rejection of his request for an MRI and consultation with a specialist, failure to order physical therapy, and failure to provide specialized footwear and a low bunk pass constituted deliberate indifference.

Viewing the evidence in the light most favorable to Monteleone, his chronic back pain constituted a serious medical need.  However, there is no genuine issue of material fact for trial regarding Defendants' treatment of his chronic back pain, or whether the treatment they provided

was deliberately indifferent.  The undisputed evidence shows that Defendants consistently provided Monteleone with medication for pain, specifically, naproxen (an NSAID), which was the only type of medication that was medically indicated.  Although Monteleone wanted Neurontin, it is undisputed that Neurontin has not been approved by the FDA for the treatment of neuropathic pain. Indeed, published medical studies showed that it was no more effective than a placebo for neuropathic pain.  Defendants' failure to provide a medication for which there was no medical evidence of its efficacy for pain relief, and instead providing a medication for which there was medical evidence showing its efficacy for pain relief, was not deliberately indifferent.[2]  *See, e.g.*, Baez v. Rogers, 522 F. App'x 819 (11th Cir. 2013) (unpublished) (even if prisoner plaintiff's inguinal hernia and entrapped nerve constituted a serious medical need, he failed to allege facts showing that defendant doctor acted with deliberate indifference by replacing Neurontin with ibuprofen or that his inguinal hernia or entrapped nerve worsened or that he suffered any permanent harm due to doctor's replacing one medication for another; instead, the complaint alleged only a difference of medical opinion as to what course of treatment was appropriate); Sears v. Thomas, No. 7:11-cv-03176-VEH-JHE, 2014 WL 4092305, at *9–10 (N.D. Ala. Aug. 7, 2014) (unpublished) (although prisoner plaintiff's chronic back pain constituted a serious medical need, he failed to show that Corizon and institutional medical staff acted with deliberate indifference by replacing Ultram with alternative pain medications such as naproxen and ibuprofen; plaintiff's disagreement with the efficacy of the recommended treatment or his preference for a different course of treatment, does not state a constitutional claim).[3]

With regard to Defendants' failure to provide surgery or a new MRI and consultation in advance of a referral for possible surgery, the undisputed evidence shows that such services were not medically indicated.  Monteleone's lower back pain and report of sensory deficits in his left leg did not medically support surgical intervention.  The undisputed medical evidence shows that before

---

[2] Dr. Alvarez states that there is evidence in Monteleone's medical record that he may be at risk for medication abuse (Alvarez Aff. ¶ 25).  He states the records reflect that Monteleone has a history of substance abuse and began using alcohol and cannabis in his early teens (*id.*).  Additionally, in April of 2013, Monteleone was found to be using "spice," a type of synthetic marijuana (*id.*).  Monteleone does not dispute this history (*see* doc. 26 at 2; Monteleone Aff. ¶ 13).

[3] The undersigned cites unpublished opinions of the Eleventh Circuit and district court opinions in this Circuit only as persuasive authority and recognizes that the opinions are not considered binding precedent.

the risks of surgery are justified, a patient should exhibit signs of neurological deficits, such as muscle wasting or the inability to properly activate muscles, but Monteleone did not exhibit any such signs.  Because surgery was not medically indicated, it was not unreasonable to deny a request for a new MRI and consultation with a specialist in advance of a referral for possible surgery.  Therefore, Defendants' failure to provide these specialized medical services was not deliberately indifferent to Monteleone's sciatica and neuropathic pain.

Dr. Alvarez could have provided Monteleone in-house physical therapy (education on physical exercises he could perform on his own), which may have alleviated some pain.  The undisputed evidence shows that Dr. Alvarez intended to provide this type of therapy, but failed to actually complete the necessary physician's order.  Dr. Alvarez states this failure was a simple mistake and not a conscious decision.  Monteleone suggests that Alvarez's alleged comment that "all [Monteleone] would be getting would be Naproxen or Ibuprofen" is evidence that Alvarez deliberately withheld physical therapy (*see* Monteleone Aff. ¶ 9).  However, Monteleone admits that this comment was made in the context of Dr. Alvarez's response to Monteleone's requests for an MRI, surgical consultation, surgery, and Neurontin.  Further, Monteleone received the physical therapy, albeit it ten months late, and he has not shown that the delay exacerbated his condition.  Indeed, Monteleone does not even allege he would have performed the exercises had he received them sooner.

Similarly, Monteleone failed to show a genuine issue of material fact for trial as to Defendants' delay in renewing his low bunk pass.  Monteleone's low bunk pass expired on May 6, 2014, and he requested renewal of the pass on May 8, 2014 (*see* doc. 22-3 at 53; doc. 26, Ex. D).  Dr. Alvarez refused to renew it, but seven months later, on December 3, 2014, ARNP Parker re-issued it (doc. 22-3 at 2; doc. 26, Ex. F).  Dr. Alvarez states that Monteleone's condition did not place him at any significantly increased risk for falls associated with being placed on an upper bunk, and his medical encounters with Monteleone did not reveal that his back condition could likely cause him to fall.  Further, although Monteleone alleges that his fall in his cell in December of 2013 was due to his left leg "giving out," which he attributes to his back condition, Dr. Alvarez states that it is his medical opinion that within a reasonable degree of medical probability Monteleone's sciatica would not have caused him to fall (Alvarez Aff. ¶ 10).  Monteleone has failed to show a genuine

issue of material fact as to whether the delay in providing the low bunk pass posed a risk of serious harm, or that Defendants were subjectively aware that it created a risk of serious harm.  Moreover, there is no evidence that the seven-month delay in reissuing the low bunk pass exacerbated his back condition.  Therefore, there is no genuine issue of fact for trial on this issue.

Finally, Monteleone failed to show a genuine issue of material fact for trial as to Defendants' failure to provide "comfort boots."  The undisputed evidence shows that "comfort boots" are medically indicated for patients with conditions that could cause problems to develop in their feet such as diabetes, or patients with foot problems such as ulcers or callouses, but such footwear is not medically indicated for sciatica.  Monteleone did not have diabetes, nor did he have ulcers or callouses on his feet.  In the absence of evidence that specialized footwear was medically indicated, Defendants' failure to provide it was not deliberately indifferent.

IV.    CONCLUSION

Viewing the evidence in the light most favorable to Monteleone, he has satisfied the "serious medical need" element of an Eighth Amendment claim.  However, Defendants have successfully negated the "deliberate indifference" element of Monteleone's claim, and Monteleone has not come forward with evidentiary material demonstrating a genuine issue of fact for trial as to this element. Therefore, Defendants are entitled to summary judgment.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Defendants' motion for summary judgment (doc. 23) be **GRANTED**; and

2.      That the clerk be directed to enter judgment in favor of Defendants and against Plaintiff and close the file.

At Pensacola, Florida this 23rd day of February 2015.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).